[Civ. No. 13668.   First Dist., Div. One.   July 26, 1948.]

CALIFORNIA COMPENSATION INSURANCE COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

Keith, Creede & Sedgwick for Petitioner.

Henry Sanford, T. Groezinger and John A. Rowe, Jr., for Respondents.

PETERS, P. J.—Petition for a writ of review.

A rehearing was granted in this case to give further consideration to the contention of petitioner that, even though an award was warranted, the award made was excessive. We are satisfied that the opinion heretofore filed correctly disposed of the other issues involved and we therefore adopt the following portions of that opinion as and for the opinion of this court on rehearing. The portions so adopted are as follows:

"The petitioner seeks to annul a death benefit award in favor of Mary Laurio, widow of Vincent Laurio, Vincent having died as the result of injuries suffered in an accident while he was performing services as a gardener for the Canterbury Hotel in San Francisco. After the writ issued, Mary Laurio

died and the children of the couple have been substituted as parties to this proceeding.

"Petitioner is the insurance carrier for the Canterbury Hotel, that company having been found to have been the employer of decedent. The major contention of petitioner is that the evidence, as a matter of law, demonstrates that decedent was not an employee but an independent contractor. There is no doubt that if the employer-employee relationship existed, the accident was industrial, and that it caused the death of Laurio. The trial referee recommended a finding that decedent was an independent contractor, but the panel of the commission found that the employer-employee relationship existed. The insurance carrier's petition for rehearing was denied, one of the three commissioners dissenting.

"The evidence on the issue in question is not entirely satisfactory, and the question presented is a very close one. Normally, of course, whether an injured employee is an independent contractor or an employee is a question of fact, and this court has no power to interfere with a finding of fact of the commission if such finding is supported by any substantial evidence or by any reasonable inference from that evidence. For petitioner to prevail on this factual issue it is necessary for it to show not only that the evidence preponderates in its favor, but that there is no substantial evidence, and no reasonable inference at all to support the challenged finding. (*Riskin* v. *Industrial Acc. Com.*, 23 Cal.2d 248 [144 P.2d 16] ; *Pacific Lbr. Co.* v. *Industrial Acc. Com.*, 22 Cal.2d 410 [139 P.2d 892] ; *Associated Indem. Corp.* v. *Industrial Acc. Com.*, 18 Cal.2d 40 [112 P.2d 615] ; *Schaller* v. *Industrial Acc. Com.*, 11 Cal. 2d 46 [77 P.2d 836].) That is a very heavy burden to assume, and while in the present case it may be that the evidence preponderates in favor of petitioner, when the record is read with the statutory background hereafter mentioned in mind, we are of the opinion that there is some evidence and some reasonable inferences from that evidence, that support the finding. This being so, this court has no power to interfere.

"The facts are as follows: The garden of the Canterbury Hotel needed cleaning up, weeding and replanting. Howard Hall, manager of the hotel, telephoned to the Sunset Nursery and asked them to do the job. He was told that the nursery could not handle the work but would be glad to recommend a competent man. Shortly thereafter one Chester Christensen and decedent visited the nursery and were informed of the needs of the hotel. It appears that Christensen and decedent

were gardeners, and, on occasion, had worked together on various jobs on a 50-50 basis. Christensen testified that he then called upon Hall; that he and Hall walked out into the garden and Hall asked how much it would cost to clean up the garden and how long it would take; that he told Hall that he could not give a bid on the job, but that 'he and his partner' would do the job for two dollars an hour each, would work eight hours a day, and that he thought the job would take five or six days; that Hall told him that this was all right; that he communicated with Laurio, the decedent, and Laurio agreed to the arrangement; that neither he nor Laurio had a regular or any place of business, and neither had a contractor's license to do gardening work; that several days later he and Laurio started to work, working eight hours a day; that it was part of the arrangement made by Christensen and Hall that Christensen was to purchase whatever plants Hall wanted from the Sunset Nursery where Christensen had an account, and that these sums were to be added to the bill; that a little profit (about 10%) was made on the plants, but the agreement with decedent was that he and Christensen were to share and share alike. Christensen also testified that Hall, during the course of the work, made certain suggestions; that Hall wanted marigolds planted in the center bed of the garden but, upon the witness' suggestion, agreed to other plants; that Hall suggested cutting back the bougainvillaea after ascertaining from the witness that this would not adversely affect the plant; that during the several days that he and decedent worked before the accident Hall kept coming out wanting to know when they would be finished. Christensen also testified that Hall did not tell him 'how' to do his work, but indicated that he 'was interested in the results after the work was finished'; that Hall did not place a specific restriction on the amount of money that was to be expended for plants, but that he, Christensen, always consulted Hall as to what plants to buy; that it was his opinion that Hall wanted the job done in the cheapest way possible; that he called to the attention of Hall that a certain tree was overhanging the garden and Hall suggested that they straighten that tree. It was during this straightening process that decedent fell and suffered the injuries that ultimately caused his death.

"Christensen was asked whether Hall had ever 'specifically' told him 'not to do any specific operation you were doing, give you definite directions about not doing any particular thing?' To this Christensen replied that he wanted to remove two

banana trees, but that Hall had ordered them not to be cut, and that he, Christensen, wanted to haul the trash away in his truck but that Hall ordered them to take it to the basement of the hotel for the garbage man to haul away; that he, Christensen, wanted to remove some trees 'in the back' but that Hall ordered them left where they were.

"Hall testified that his agreement with Christensen was that Christensen agreed to put the garden into shape at a total labor cost of two dollars per hour per man; that Christensen was to supply the plants and materials and charge for them; that he could not recall the conversation with respect to how many men would be engaged on the job, but he would not deny that such a conversation took place; that prior to the accident he had had no conversation at all with decedent except to say 'hello'; that he had never instructed decedent as to how the work was to be done; that he did suggest to Christensen that it would be a good idea to straighten the tree, but 'at no time did I give him any instructions on how to do it'; that he had merely instructed Christensen to clean up the garden; that there were great masses of vines and dead shrubs that had to be removed; that he had paid the labor and materials bill submitted by Christensen, and that no payroll deductions were made from that sum; that neither the name of Christensen nor of Laurio ever was entered on the hotel payroll record.

"That is substantially all of the evidence on the basic issue of whether decedent was an employee of the hotel or an independent contractor. Before discussing the question of the sufficiency of the evidence to support the finding of the employer-employee relationship, certain statutory provisions should be mentioned.

■ "Section 3351 of the Labor Code provides: ' "Employee" means every person in the service of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written, . . .'

"Section 5705 of that code provides:

" 'The burden of proof rests upon the party holding the affirmative of the issue. The following are affirmative defenses, and the burden of proof rests upon the employer to establish them:

" ' (a) That an injured person claiming to be an employee was an independent contractor or otherwise excluded from the protection of this division where there is proof that the injured person was at the time of his injury actually performing service for the alleged employer.'

"Section 3353 provides: ' "Independent contractor" means any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished.'·

"Thus, under these sections, the burden of proof is upon the one contending that a person rendering a service for another is an independent contractor. Upon proof of the rendition of service for another the applicant has proved the existence of the employer-employee relationship and the burden is upon the employer to prove that the applicant was an independent contractor. There have been many cases discussing this problem. The rules announced in these cases have been quite uniformly expressed, but the application of those rules to various factual situations has presented considerable difficulty. No useful purpose would be served by analyzing the many cases on this subject. A reference to two recent cases will suffice to indicate the trend of the authorities. In *Perguica* v. *Industrial Acc. Com.*, 29 Cal.2d 857 [179 P.2d 812], the case principally relied upon by petitioner, an award of the commission based upon a finding that the respondent was an employee was annulled, the Supreme Court holding that, as a matter of law, respondent was an independent contractor. The Supreme Court recognized the rule that: 'Generally speaking, it is a question of fact to be determined by the commission, from the evidence adduced, whether the essential employer-employee relationship exists, . . . and the commission's finding on that issue will not be disturbed where it is supported by substantial evidence' (p. 859), but also recognized that 'if from all the facts only a single inference and one conclusion may be drawn, whether one be an employee or an independent contractor is a question of law.' (P. 859.) The court then attempted to summarize the factors that should be considered in determining whether the particular services fall into one or the other categories involved. After giving the statutory definition of an independent contractor contained in section 3353 of the Labor Code, *supra*, the court stated (p. 859) : 'The distinction between the status of an independent contractor and that of an employee rests upon several important considerations. A material and often conclusive factor is the right of an employer to exercise complete and authoritative control of the mode and manner in which the work is performed. The existence of such right of control, and not the extent of its exercise, gives rise to the employer-employee relationship. [Citing cases.] Strong

evidentiary support of the employment relationship is "the right of the employer to end the service whenever he sees fit to do so." [Citing cases.] "An employee may quit, but an independent contractor is legally obligated to complete his contract." [Citing cases.] There are "other factors to be taken into consideration," as stated in *Empire Star Mines Co. v. California Employment Commission*, 28 Cal.2d 33 [168 P.2d 686], at page 43 . . .: "(a) whether or not the one performing services is engaged in a distinct occupation or business; (b) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the principal or by a specialist without supervision; (c) the skill required in the particular occupation; (d) whether the principal or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (e) the length of time for which the services are to be performed; (f) the method of payment, whether by the time or by the job; (g) whether or not the work is a part of the regular business of the principal; and (h) whether or not the parties believe they are creating the relationship of employer-employee. (Rest., Agency, § 220; Cal.Ann., § 220.)" '

"The factual situation involved in the case was as follows: Perguica was constructing a house on his farm. Part of the necessary construction was to have affixed to the outside of the house some wire netting to serve as lathing for the plasterer. One Walker agreed to furnish and to install the netting for fifteen cents per yard. Perguica knew nothing about lathing and did not discuss any of the details of the work with Walker. Payment was to be made after the work was completed according to the number of rolls of wire used. Perguica was to furnish the wire, but Walker was to use his own tools and equipment. Walker suffered fatal injuries in transporting certain materials to the job. No provision was made in the agreement as to how many men Walker was to use on the job, and there was no agreement that Perguica could discharge Walker. Perguica testified that the carpenters on the job were paid by the day and were loafing on the job, and for that reason hired Walker to do the complete job at fifteen cents per yard. The court held that those facts demonstrated 'this to be a case of independent contractorship.' (P. 861.)

"The respondents place their main reliance on the case of *Riskin* v. *Industrial Acc. Com.*, 23 Cal.2d 248 [144 P.2d 16]. There the Supreme Court affirmed an award based on a finding that the applicant was an employee. The carrier, as in the

instant case, contended that the applicant was an independent contractor. The facts were these: The injured worker and another were hired to 'drive' a tunnel. They were to be paid at the rate of $7.00 per foot of tunnel dug, and Riskin gave them specific directions as to the length, size and direction of the bore. Riskin furnished the tools, but the two men furnished the explosives. The court emphasized that Riskin had the right to discharge the two men at any time, and the opinion affirming the award is largely based on this factor.

"If these rules be applied to the present case it would appear that there is some evidence, weak it is true, from which it may be deduced that these men were employees of the hotel. There is nothing in the evidence to show whether Hall could have discharged the men, or whether the men could have quit, before completing the job, but it is a reasonable inference from the nature of the work being performed and the method of payment—by the hour and not by the job—that the right of discharge by Hall and the right of quitting existed. That factor, alone, under the Riskin case, *supra,* supports the finding that the two men were employees. There is also evidence that Hall exercised some control over the work. It is a reasonable inference that Hall had the legal right to tell the gardeners what to plant, what to remove, and how the work should be done. In the very nature of the work it was impossible for Hall and the two gardeners to agree in advance concerning the details of the entire job. The record shows that Hall generally supervised the work as it progressed by giving orders as to what should or should not be planted or removed.

"The fact that Christensen and Laurio considered themselves as partners for this job does not help petitioner. Section 3360 of the Labor Code provides: 'Workmen associating themselves under a partnership agreement, the principal purpose of which is the performance of the labor on a particular piece of work are employees of the person having such work executed.'

"It is undoubtedly true that there is evidence, substantial evidence, perhaps a preponderance of the evidence, that would have supported a finding that the men were independent contractors. But that is not the problem here presented. In this case the commission has found that decedent was an employee. There is no doubt that decedent was rendering services for the hotel. That raises an inference, under the applicable statutes, that decedent was an employee, and places the burden of proof upon the hotel to prove the contrary. Under such

circumstances we think that, under the record here presented, the commission was justified in finding that the petitioner did not sustain the burden placed upon it, and was justified in finding that decedent was an employee.''

■ The petitioner contends that the widow of decedent was not entitled to a full death benefit of $6,000, payable at $25 per week as found by the commission, it being urged that the average earnings of decedent were such as to require a smaller award. Prior to the oral argument the widow died, and the adult children of the couple have been substituted as parties. None of these children was dependent on decedent. Section 4706 of the Labor Code provides that upon the death of a dependent beneficiary, where there is no surviving dependent, ''. . . the death benefit terminates and does not survive to the estate of the deceased dependent, except that payments of the death benefit accrued and payable at the time of the death of the sole remaining dependent shall be paid upon the order of the commission to the heirs of the dependent . . . without administration.'' Thus the nondependent children are entitled to all payments that accrued up to the date of the death of Mary Laurio. If the award had been for less than $6,000, the weekly payments that would rightfully have accrued prior to Mary Laurio's death would have been less than $25 per week, so that the correctness of the finding to the effect that she was entitled to the full death benefit is still in issue.

■ The evidence as to the earning capacity of Vincent Laurio prior to his death is somewhat sketchy and incomplete. Prior to the fatal accident he was in good health. The accident causing death occurred in March, 1947. A daughter of the deceased testified that prior to 1947, the decedent had worked intermittently, but that during 1947, he was in excellent health and worked regularly. In 1946, he worked intermittently and earned between $900 and $1,000. The only evidence as to his 1947 earnings was that he was paid $2.00 per hour while working on the job where he was killed.

Section 4452 of the Labor Code provides that no death compensation award could exceed $6,000. Section 4702 provides that in case of total dependency (and it is admitted that Mary Laurio was totally dependent), the death benefit shall be three and one-half times the average annual earnings of the deceased employee.

Petitioner contends that, at most, the death benefit could not exceed three and one-half times $1,000 (that having been the employee's annual earnings for 1946), or a total benefit of

$3,500. The Labor Code provides, in some detail, how average earnings shall be computed. Section 4453, as it read at the time of the accident, provided:

"In computing average annual earnings, the average weekly earnings shall be taken at not less than $10, nor more than $38.46. Between these limits the average weekly earnings, except as provided in sections 4456 to 4459, shall be arrived at as follows:

"(a) . . . Where the employment is for thirty or more hours a week and for five or more working days a week, the average weekly earnings shall be 95 per cent of the number of working days a week times the daily earnings at the time of the injury. . . .

"(d) . . . Where the employment is for less than thirty hours per week, or where for any reason the foregoing methods of arriving at the average weekly earnings cannot reasonably and fairly be applied, the average weekly earnings shall be taken at 95 per cent of the sum which reasonably represents the average weekly earning capacity of the injured employee at the time of his injury, due consideration being given to his actual earnings from all sources and employments."

Subdivision (a) above would seem to be here applicable. When injured the employee had agreed to work eight hours a day for $2.00 per hour, and the job was to take five or six days. Computed under subdivision (a), the average earnings far exceeded the maximum of $38.46 per week, and required the maximum benefit.

If subdivision (a) is not applicable, then subdivision (d) would be applicable. Under that section it was for the commission, on the evidence, to calculate the average weekly earning capacity of the deceased employee. It must be held that in finding that the deceased employee's weekly earnings at the time of death were at least $38.46 (thus warranting the $6,000 award), the commission did not abuse its powers. The correct rule is laid down in the concurring opinion in *Neahr* v. *Industrial Acc. Com.*, 13 Cal.App.2d 146 [56 P.2d 568], at page 150, as follows: "The law clearly contemplates that the judgment of the commission shall prevail and shall be conclusive unless there is an abuse of discretion. Such an abuse of discretion is held to occur when there is a total absence of evidence to support the findings. On the other hand, if there is any evidence, even though it may be slight and afford a ground for a wide difference of opinion, the court is without authority in the premises to set the award aside."

The evidence in the instant case is that the deceased employee, when injured, was making $16 per day. Christensen, his associate, testified that, on the average, he was making, out of gardening work, about $45 per week. ▋ The commission could take judicial knowledge of the fact that during March of 1947 economic conditions were such that opportunities for employment were very good. (*Gartner* v. *Roth,* 26 Cal. 2d 184 [157 P.2d 361].) The fact that Laurio worked but intermittently in 1946, apparently because of ill health, does not, as a matter of law, make him an intermittent employee for 1947, and does not make his earning record for 1946 conclusive as to his earning power in 1947. The evidence was that in 1947 he was in excellent health, and working regularly and steadily. This serves to distinguish the case of *West* v. *Industrial Acc. Com.,* 79 Cal.App.2d 711 [180 P.2d 972], so strongly relied upon by petitioner. In that case the employee testified that she did not have the physical ability to work regularly, and therefore her past intermittent earnings were a guide to her earnings when injured. That is not this case.

▋ In its closing brief the petitioner, for the first time, cites Labor Code, section 4457. It provides: ''In the event the average weekly earnings of workmen associating themselves under a partnership agreement, the principal purpose of which is the performance of labor on a particular piece of work, are not otherwise ascertainable, they shall be deemed to be twelve dollars.''

This section is not applicable because, as already pointed out, the commission, under subdivision (a) of section 4453 had some evidence, weak though it may be, of the average weekly earnings. The above-quoted section is only applicable where the average weekly earnings ''are not otherwise ascertainable.'' Thus, even if section 4457 is applicable to a ''partnership'' of the type here disclosed, it has no application to the present case.

The award, subject to the provisions of section 4706 of the Labor Code, is affirmed.

Ward, J., and Bray, J., concurred.